# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

TELETHA HOWARD,

<em>Plaintiff</em>,

v.

BLUE RIDGE HEALTH DISTRICT,

<em>Defendant</em>.

Case No.: 3:22-cv-00003

<u>MEMORANDUM OPINION</u>

Judge Norman K. Moon

The plaintiff was the lead community health worker at the Blue Ridge Health District. She claims that during her employment her white coworkers committed "microaggressions" and discriminated against her as a Black woman, though she relies more on conclusory language than on specifics. She also alleges that she tried, but failed, to get the Health District to adopt diversity and inclusion training. And she asserts that she reported perceived inequities in the Health District's deployment of resources, thus contending that the District did not deploy resources to predominantly "Black and Brown communities" equitably. Instead, she claims that resources were disproportionately spent in mostly Caucasian areas. The plaintiff reported microaggressions against her to the District's Human Resources Department and they held a meeting in July 2021. The District terminated her position in early October 2021.

Since the plaintiff has not alleged facts that, taken as true, would support a plausible discrimination claim, or that she was subjected to a hostile work environment or retaliation, the Court will dismiss the case.

1

Background[1]

Plaintiff Teletha Howard alleges that she was hired by Defendant Blue Ridge Health District ("BRHD") in March 2021 as a community health worker. Am. Compl. ¶ 7. In August 2021, she was promoted to the position of Lead Community Health Worker. *Id.* ¶ 8. Pay raises accompanied her arrival working at BRHD and at the time of her promotion. *Id.* ¶¶ 12–14. Plaintiff asserts that she was highly qualified for her position and "received … praise" for her work throughout the course of her employment. *Id.* ¶¶ 12, 17–18.

However, Plaintiff alleges that she experienced discrimination during her employment at BRHD. She alleges that "[t]he earliest incident of discrimination was on March 1, 2021, and the latest date discrimination took place against Plaintiff was on October 5, 2021." *Id.* ¶¶ 16, 20. Plaintiff does not describe the alleged "earliest incident of discrimination," though she generally describes the circumstances of her termination on October 5, 2021. Plaintiff further alleges that her "coworkers who instigated microaggressions and supervisors were primarily [C]aucasian." *Id.* ¶ 19. She does not elaborate upon these alleged "microaggressions." But, she alleges, "upon reporting an incident of microaggression,"—again, unspecified—"Plaintiff was removed from her workplace, but the white coworker was allowed to remain." *Id.* ¶ 36.

Plaintiff asserts that "[t]hroughout [her] employment, [she] was denied the opportunity to give appropriate input concerning diversity and inclusion training for all employees." *Id.* ¶ 9. However, her "request for diversity and inclusion training was met with dismissiveness from multiple supervisors." *Id.* ¶ 23. Plaintiff alleges that "[b]ecause [BRHD] denied [her] request for diversity and inclusion training, Plaintiff endured racial and gender discrimination, harassment,

---

[1] As this case is before the Court on a motion to dismiss, the Court must assume "all well-pleaded, nonconclusory factual allegations in the complaint to be true." *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 391 (4th Cir. 2011).

and retaliation for errors that could have been avoided with training, such as company-wide diversity and inclusion training." *Id.* ¶ 10;[2] *id.* ¶ 32 (alleging that Plaintiff "repeatedly requested diversity and inclusion training and was denied each request"); *id.* ¶ 33 ("As a result of the lack of training, Plaintiff was repeatedly harassed for fixable errors."). For the most part, she does not elaborate on the "racial and gender discrimination, [or] harassment," she faced, nor what "errors [ ] could have been avoided" with such diversity and inclusion training. Plaintiff does say that "[f]or most of the time working with BHRD, [she] felt 'less than.'" *Id.* ¶ 37.

Plaintiff points to two instances of perceived harassment, in support of her allegation that she was "subjected to pervasive harassment" at BHRD. *Id.* ¶ 44. First, she alleges that she "endured being hit by a glass door by a coworker." *Id.* ¶ 47. Plaintiff alleges that BHRD "acknowledged physical harassment by a coworker toward [her]," but "did not intervene to stop the physical harassment." *Id.* ¶¶ 45–46. Second, Plaintiff alleges she experienced "emotional harassment by another coworker who 'became verbally aggressive' and shook her finger in the Plaintiff's face." *Id.* ¶ 48. Plaintiff reported both instances to her supervisor, and understood that the Health Director for BHRD "was also made aware of these incidents." *Id.* ¶¶ 49–50. Plaintiff writes that a Human Resources representative "addressed one microaggression by setting up a peer mediation session with the other coworker involved," but otherwise did nothing to "stop harassment towards Plaintiff." *Id.* ¶¶ 51–52. Plaintiff also alleges that "other Black and Brown coworkers faced similar microaggressions." *Id.* ¶ 53.

Plaintiff also alleges that BHRD "provided vaccine clinics in communities of color with lesser service than those of clinics where most of the vaccine recipients were white." *Id.* ¶ 11.

---

[2] Notwithstanding Plaintiff's stray reference to discrimination on account of her gender, she does not allege any facts to support such a claim, nor did she assert a gender discrimination claim to the EEOC or raise that claim in her complaint.

She alleges that "similarly situated predominantly white vaccine centers were more adequately staffed than those of largely underrepresented minorities." *Id.* ¶ 38. However, Plaintiff writes that her "coworkers seemed unhappy with the suggestions she had for ways to improve services in Black and Brown communities." *Id.* ¶ 35.

Plaintiff alleges that on September 23, 2021, she "was removed from her position to work at [an] 'AHS football game,'" but does not describe what her position at the game entailed, or why she was removed from that position. *Id.* ¶ 15. Then, on October 5, 2021, BHRD "notified Plaintiff of immediate termination, without prior notice or work-related warnings." *Id.* ¶ 16. She was told, "Your services are no longer needed." *Id.* ¶ 21.

Plaintiff alleges that BHRD's "lack of intervention in Plaintiff's complaints to supervisors and subsequent termination was based on her race," and that the "disparate treatment faced by Plaintiff was because of her race." *Id.* ¶¶ 22, 25. Plaintiff alleges that "[t]he white employees were not dismissed from their positions like [she was]." *Id.* ¶ 24; *see also id.* ¶ 39 ("No white employees were terminated by [BHRD] during the period when Plaintiff was terminated.").

After Plaintiff was terminated, she initiated a Charge of Discrimination with the EEOC. *See* Dkt. 2-1 (EEOC Charge). Therein, Plaintiff alleged that during her employment at BRHD, she "was subjected to racially motivated microaggressions by a [Caucasian] coworker," which she reported to her supervisors and Human Resources. *Id.* at 3. She also wrote that she "reported to them that [she] believed that the clinics for the Black and Brown communities were not being handled in an equal way to the clinics for Caucasian communities." *Id.* Then, "[o]n or about July 16, 2021, [she] met with different individuals in Human Resources to discuss the microaggressions displayed against me by my co-worker (Caucasian) and that I believed I was

being discriminated against because of my race (African American)." *Id.* But "[n]othing was done by [her] employer to investigate or correct the problem." *Id.* She also alleged that, between July 16 and October 5, 2021, she "consistently pushed for training regarding diversity and inclusion." *Id.* Finally, on about October 5, 2021, "[her] employment was terminated." *Id.* Plaintiff therefore claimed discrimination on the basis of her race, and retaliation. *Id.* In October 2021, the EEOC issued Plaintiff a right-to-sue letter.

Plaintiff initially filed this suit *pro se* and moved for leave to proceed *in forma pauperis*. *See* Dkts. 1, 2. The Court granted Plaintiff's motion. Dkt. 3. Thereafter, Plaintiff retained counsel who entered an appearance on her behalf, who filed the operative Amended Complaint. Dkt. 7. Counsel for the Virginia Department of Health entered a "limited and special appearance on behalf of Blue Ridge Health District," and filed the motion to dismiss the complaint. Dkt. 14. In the brief in support of BRHD's motion to dismiss, Defense counsel argued that BRHD does not have the capacity to be sued. Dkt. 15 at 3–5. Counsel proceeded to argue that Plaintiff had failed to state a plausible claim to relief in her Amended Complaint. *Id.* at 5–13. In response, Plaintiff filed an opposition to BRHD's motion to dismiss, which requests, in the alternative, leave to file a second amended complaint. Dkt. 18. Plaintiff did not argue that BRHD could be sued, but rather contended that even if BRHD could not be sued, Plaintiff should be granted leave to amend her complaint. Dkt. 19 at 3–6. BHRD filed a reply in further support of dismissal.

Plaintiff also filed, without leave of court, a Second Amended Complaint. Dkt. 23. The Court issued an order striking the Second Amended Complaint, as it was filed without leave of Court or the consent of BRHD. Dkt. 24 at 2 (citing Fed. R. Civ. P. 15(a)(2)). The Court afforded Plaintiff seven days to file a motion for leave to amend the complaint, which she filed within the

allotted time. Dkt. 26. The motion to dismiss, and Plaintiff's two filings seeking leave to amend, are ripe for decision.

Standard of Review

"A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the claims pled in a complaint." *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019). It does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). "This pleading standard does not require detailed factual allegations." *ACA Fin. Guar. Corp.*, 917 F.3d at 211 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Instead, "[t]o meet the Rule 8 standard and 'survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."'" *Nadendla v. WakeMed*, 24 F.4d 299, 305 (4th Cir. 2022) (quoting *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))). The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, with all allegations in the complaint taken as true and all reasonable inferences drawn in the plaintiff's favor, *King*, 825 F.3d at 212. However, the Court need not "accept the legal conclusions drawn from the facts," or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Simmons v. United. Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011) (internal quotes omitted).

Rule 15 of the Federal Rules of Civil Procedure provides that leave to amend a complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). This is a highly permissive standard. *Galustian v. Peter*, 591 F.3d 724, 729 (4th Cir. 2010). Leave to amend

"'should be denied *only when* the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile.'" *Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999) (citation omitted). Amendment is futile when it "is clearly insufficient or frivolous on its face." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 510 (4th Cir. 1986). For example, the court may "disallow[ ] an amendment when the claim sought to be pleaded by amendment plainly would be subject to a motion to dismiss." *Frank M. McDermott, Ltd. v. Moretz*, 898 F.2d 418, 420–21 (4th Cir. 1990).

<u>Reasoning</u>

The parties agree that BRHD is not a legal entity capable of being sued. Dkt. 15 at 3–5; Dkt. 19 at 3–6; Dkt. 26 at 1. The reason is that it is an operating division of the Virginia Department of Health and lacks statutory authority to be sued in its own right. *See Ross v. Franklin Cnty. Dep't of Soc. Servs.*, 186 F. Supp. 3d 526, 534 (W.D. Va. 2016) ("In Virginia, an operating division of a governmental entity cannot be sued unless the legislature has vested the operating division with the capacity to be sued."). As the parties agree that the Virginia legislature has not vested BRHD with the capacity to be sued, the Court proceeds to consider whether Plaintiff should be allowed to amend her complaint for a second time to replace the Virginia Department of Health as the named Defendant, or whether amendment would be futile because Plaintiff has failed to state a claim.

Plaintiff raises three claims in her Amended Complaint: (1) racial discrimination in violation of Title VII of the Civil Rights Act; (2) hostile work environment; and (3) retaliation. The Court will address each in turn.

1. <u>Discrimination</u>

Plaintiff's first claim is that she was discriminated against on account of her race and subjected to disparate treatment, in violation of Title VII. *See* Am. Compl. ¶¶ 29–41.

Title VII "prohibits employment discrimination on the basis of race, color, religion, sex, or national origin," and the statute "prohibits both intentional discrimination (known as 'disparate treatment') as well as, in some cases, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as 'disparate impact')." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). Absent direct evidence of discrimination, "the elements of a prima facie case of discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (citing *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004)).

Plaintiff has not alleged a *prima facie* case of discrimination because her First Amended Complaint lacks factual allegations that, taken as true, would establish the fourth element— different treatment from similarly situated employees outside the protected class.[3] "Where a plaintiff attempts to rely on comparator evidence to establish circumstances giving rise to an inference of unlawful discrimination, however, '[t]he similarity between comparators … must be

---

[3] The parties dispute whether Plaintiff's allegations establish the first element: her membership in a protected class. Dkt. 19 at 7; Dkt. 25 at 2–3. However, Plaintiff asserts in her EEOC charge that she is African American, *see* Dkt. 2-1 at 3, and the Court deems that document incorporated by reference. Thus, the Court finds that challenge lacking merit. The parties also dispute whether Plaintiff alleged another adverse action on account of her alleged "remov[al] from her position to work at [the] 'AHS football game.'" Am. Compl. ¶ 15. In light of the fact that it is conceded her termination the following month constitutes adverse action, the Court concludes that any dispute concerning her removal from work at that game is immaterial to the success or failure of her discrimination claim.

clearly established in order to be meaningful.'" *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F.

App'x 745, 748 (4th Cir. 2017) (unpublished) (quoting *Lightner v. City of Wilmington, N.C.*, 545

F.3d 260, 265 (4th Cir. 2008)). Rather, the inquiry asks "whether there are sufficient

commonalities on the key variables between the plaintiff and the would-be comparator to allow

the type of comparison that, taken together with the other prima facie evidence, would allow a

jury to reach an inference of discrimination.'" *Id.* (quoting *Eaton v. Ind. Dep't of Corr.*, 657 F.3d

551, 556 (7th Cir. 2011)).

Here, Plaintiff simply has alleged in her First Amended Complaint that "[t]he white

employees were not dismissed from their positions like the Plaintiff," and that "[n]o white

employees were terminated by [BRHD] during the period when Plaintiff was terminated." Am.

Compl. ¶¶ 24. 39. Those allegations are wholly insufficient and lacking in any factual detail—

much less that which would permit a meaningful comparison between Plaintiff and any white

employee of BRHD such that the jury could reach an inference of discrimination on account of

differing treatment. Accordingly, "[a]bsent further factual development," Plaintiff has "fall[en]

short of alleging facts from which to reasonably infer that their difference in treatment was

attributable to racial discrimination." *See Swaso*, 698 F. App'x at 749; *see also Coleman*, 626

F.3d at 191 (where complaint alleged plaintiff "was treated differently as a result of his race than

whites," and even specifically identifying one white comparator, but otherwise failing to

establish they were "actually similarly situated," was insufficient to create a meaningful

comparison).

To be sure, the law did not require Plaintiff to identify a similarly situated white

comparator to succeed on a discrimination claim. *See Bryant v. Aiken Reg'l Med. Centers Inc.*,

333 F.3d 536, 545–46 (4th Cir. 2003) ("[Plaintiff] is not required as a matter of law to point to a

similarly situated white comparator in order to succeed on a race discrimination claim."). That is, so long as the plaintiff "can establish an inference of unlawful discrimination through other means," such as by "infer[ring] discriminatory intent from evidence of a general pattern of racial discrimination in the practices of a defendant." *Swaso*, 698 F. App'x at 748. However, Plaintiff in this case solely tries to support the plausibility of her claim via a *prima facie* case of discrimination through the *McDonnell Douglas* burden-shifting framework and does not contend that she has alleged a plausible disparate treatment claim so as to satisfy Rule 8 on any other basis. *See* Dkt. 19 at 6, 9. Nor would she be able to.

Most of the allegations in the Amended Complaint summarily claim that Plaintiff was subjected to "discrimination" or "microaggressions," or adverse treatment "based on her race," without factual enhancement. *See, e.g.*, Am. Compl. ¶¶ 10 (alleging that without diversity training, "Plaintiff endured racial and gender discrimination, harassment, and retaliation …"); *id.* ¶ 19 ("Plaintiff's coworkers who instigated microaggressions and supervisors were primarily [C]aucasian."); *id.* ¶ 20 (describing dates of "incident[s] of discrimination," without elaboration); *id.* ¶ 22 (BRHD's lack of response to Plaintiff's complaints "was based on her race"); *id.* ¶ 25 ("The disparate treatment faced by Plaintiff was because of her race."); *id.* ¶ 35 ("upon reporting an incident of microaggression," without elaboration); *id.* ¶ 51 (HR "addressed one microaggression by setting up a peer mediation session," without elaboration); *id.* ¶ 53 ("other Black and Brown coworkers faced similar microaggressions"); *id.* ¶¶ 58–61; *see also* Dkt. 2-1 at 3 (EEOC Charge) (alleging Plaintiff met with Human Resources "to discuss the microaggressions displayed against me by my co-worker (Caucasian) and that I believed I was being discriminated against because of my race (African American)").

But, "to survive a motion to dismiss, the complaint must set forth specific facts giving rise to an inference of discrimination; conclusory allegations of discrimination are insufficient." *See, e.g.*, *Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 782 (D. Md. 2010) (citing *Simpson v. Welch*, 900 F.2d 33, 35 (4th Cir. 1990)); *see also Simpson*, 900 F.2d at 35 ("Appellant's conclusory allegations of discrimination and harassment do not state a claim upon which relief can be granted."); *Iqbal*, 556 U.S. at 663 ("the tenet that a court must accept a complaint's allegations as true are inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements"); *id.* at 678 ("naked assertion[s] devoid of further factual enhancement" will not suffice to state a claim).

Plaintiff alleges that she pushed for diversity and inclusion training, but that such efforts were rebuffed, and that the lack of training resulted in "fixable errors," Am. Compl. ¶¶ 9–10, 23, 32–33; that Plaintiff suggested ways to "improve services in Black and Brown communities" but her "coworkers seemed unhappy with the suggestions," *id.* ¶¶ 11, 35, 38; that Plaintiff "felt 'less than'" for "most of the time" she worked at BRHD, *id.* ¶ 37; at one point, she "endured being hit by a glass door by a coworker," *id.* ¶ 47, and at another point, "another coworker [] 'became verbally aggressive' and shook her finger in the Plaintiff's face," *id.* ¶ 48. BRHD set up a "peer mediation session" to address "one microaggression," but otherwise did not take any steps to stop Plaintiff's perceived harassment, *id.* ¶¶ 51–52. These allegations, in connection with the rest of Plaintiff's complaint and EEOC charge, do not state a plausible claim of intentional discrimination or disparate treatment of Plaintiff on account of her race. Simply put, Plaintiff's allegations of race discrimination in her First Amended Complaint "do not rise above speculation." *See Coleman*, 626 F.3d at 191.

Plaintiff's allegations in her proposed Second Amended Complaint fare no better and are similarly conclusory and devoid of necessary factual enhancement.[4] *See, e.g.*, Second Am. Compl. ¶ 11 (alleging that Plaintiff "experienced and witness a number of discriminatory actions," without elaboration); *id.* ¶ 12 (alleging she experienced "discriminatory and harassing behaviors," without elaboration); *id.* ¶ 13 (same, with respect to "numerous instances of discriminatory behavior"); *id.* ¶ 14 (same, with respect to her "seeking to correct the discriminatory actions and behaviors that she and other minority coworkers were experiencing"); *see also id.* ¶ 26 (alleging she experienced "a number of harassing behaviors that created a hostile work environment," without elaboration). Similarly, Plaintiff alleges in conclusory fashion that she reported "an incidence of *aggression* by a white coworker," but that Defendant improperly "removed Plaintiff from the Mobile Unit and allowed the *aggressive* white coworker to remain." *Id.* ¶ 17 (emphases added).

Plaintiff also asserts in her proposed Second Amended Complaint that there were "a multitude of racially motivated aggressions" against her, specifically identifying "being hit by a glass door," as well as "her ultimate termination without cause by two of her supervisors." *Id.*

---

[4] The Court struck Plaintiff's proposed Second Amended Compliant because it was filed without leave of court or consent of the opposing party. Dkt. 23-1. Plaintiff opposed BRHD's motion to dismiss on the basis of the sufficiency of the allegations in the First Amended Complaint, Dkt. 19 at 6, 10, 11 (arguing that Counts I, II and II "of the Amended Complaint [do] state a claim"), not those in the putative Second Amended Complaint, which had not yet been filed, Dkt. 23. Although Plaintiff requested leave to amend, nowhere has Plaintiff argued (much less developed any argument) that her *updated* allegations in the proposed Second Amended Complaint state a plausible claim to relief and defeat BRHD's arguments for dismissal. Dkt. 26. Accordingly, the Court would not necessarily have to consider the allegations in the Second Amended Complaint. To be comprehensive, the Court will address them for the purpose of considering whether Plaintiff should be afforded leave to amend, or whether leave to amend should be denied on grounds of futility because even the allegations in his proposed Second Amended would fail to state a plausible claim.

¶ 27. But again, Plaintiff alleges no facts that would add any racial component or character to her "being hit by a glass door," or "her ultimate termination without cause." And implying a racial motivation or element to either act, without supporting allegations of fact, would impermissibly rely on conjecture.

Significantly, Plaintiff's proposed Second Amended Complaint also fails to include allegations of fact that would render it plausible that she suffered "different treatment from similarly situated employees outside the protected class." *Coleman*, 626 F.3d at 190. While the law "does not require proof of all of the elements of a *prima facie* case of racial discrimination," it does "require[ ] that plaintiffs plausibly meet these elements." *Martinez v. Constellis, LLC*, No. 3:19-cv-720, 2020 WL 4589194, at *3 (E.D. Va. Aug. 10, 2020) (citing *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 617 n.8 (4th Cir. 2020) (recognizing elements of a *prima facie* case of discrimination under Title VII)). Again, "[a]lthough this standard does not require the plaintiff as a matter of law to point to a similarly situated comparator to succeed on a discrimination claim, if a plaintiff bases his or her allegations completely upon a comparison to an employee from a non-protected class, then the validity of his or her *prima facie* case depends upon whether that comparator is indeed similarly situated." *Martinez*, 2020 WL 4589194, at *4 (originally citing *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010)) (cleaned up).

Plaintiff's allegations in her proposed Second Amended Complaint are somewhat more thorough than those in her Amended Complaint concerning comparators. Plaintiff alleges that, in contrast to the treatment she received, "her non-black coworkers on the Mobile Unit were treated more favorably by [BRHD]." Second Am. Compl. ¶ 38. She alleges that "[t]hese employees performed similar or identical roles to Plaintiff, such as organizing vaccine clinics, preparing vaccines for distribution to communities, registering people for vaccinations, and acting as Site

13

Coordinators." *Id.* ¶ 39. These non-black coworkers "were under the same supervisors as Plaintiff, as they were also on the Mobile Unit." *Id.* ¶ 40. Indeed, Plaintiff points to three specific allegations to establish that BRHD gave "more favorable treatment" to these comparators: that (1) "Despite [BRHD] removing Plaintiff from the Mobile Unit after reporting the aggressive non-black coworker, the aggressive non-black coworker was allowed to remain on the Mobile Unit," (2) "A non-black comparator that was fired during Plaintiff's employment with Defendant was given advance notice of her termination and given the option to quit or be fired, whereas Plaintiff was suddenly fired without any such notice or choice," and (3) "Allowing non-black comparators to remain on or be assigned to the AHS football game, despite Plaintiff and another black coworker being pulled at the last second from staffing the event." *Id.* ¶ 42. Plaintiff concludes that, "[t]hus, [BRHD] treated Plaintiff demonstrably different from any non-black comparators." *Id.* ¶ 43.

Notwithstanding the additional verbiage included in Plaintiff's proposed Second Amended Complaint on this issue, her allegations do not plausibly establish that Plaintiff suffered "different treatment from similarly situated employees outside the protected class." *Coleman*, 626 F.3d at 190. Nor has Plaintiff plausibly established that those purported comparators, her non-black coworkers, were "indeed similarly situated," *see Martinez*, 2020 WL 4589194, at *4, in that they were "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it," *Haywood*, 387 F. App'x at 359. Even crediting Plaintiff's allegations that her non-black coworkers in the Mobile Unit performed similar roles and tasks, and reported to the same supervisors, *see* Second Am. Compl. ¶¶ 39–40, Plaintiff's allegations are too conclusory and sparse to plausibly establish that they engaged in the same conduct without differentiating or

mitigating circumstances. For instance, Plaintiff alleges that she was removed from the Mobile

Unit "after reporting the aggressive non-black coworker," while "the aggressive non-black

coworker was alleged to remain on the Mobile Unit." *Id.* ¶ 42(A). Critically, however, *no* factual

allegations are included concerning any perceived (or actual) "aggressive" acts by this unnamed

"non-black coworker," the circumstances under which Plaintiff reported her co-worker, or

indeed any facts at all elaborating on this incident or incident(s). The lack of supporting factual

allegations in her complaint renders it impossible to accept Plaintiff's legal argument that she

and this unnamed coworker were indeed similarly situated.

Plaintiff also alleges that "[a] non-black comparator that was fired during Plaintiff's

employment with Defendant was given advance notice of her termination and given the option to

quit or be fired, whereas Plaintiff was suddenly fired without any such notice or choice." *Id.*

¶ 42(B). Again, the complaint lacks any factual allegations about the circumstances under which

this unnamed "non-black comparator" was fired or conduct that may have prompted termination

of employment. Without such factual allegations, the Court could only rely on speculation to

infer that she and this other unnamed person were indeed "similarly situated," such as might give

rise to an inference of racial discrimination on account of the alleged different circumstances of

their terminations. Lastly, Plaintiff alleges that BRHD "allow[ed] non-black comparators to

remain on or be assigned to the AHS football game, despite Plaintiff and another black coworker

being pulled at the last second from staffing the event." *Id.* ¶ 42(C). But again, Plaintiff fails to

allege any other facts concerning the other purported comparators, staffing needs for the BRHD

at the football game, what BRHD's role was at the football game, the circumstances and timing

of any employee's decision to work at the game, or the circumstances of BRHD's ultimate

decision that Plaintiff and one other black coworker would not be needed "at the last second" to

staff the event, while others were. At bottom, Plaintiff's sparse factual allegations establish no more than a "general accusation that [she] was treated differently as a result of [her] race," which does not state a plausible racial discrimination claim under Title VII. *See Robinson v. Loudoun Cnty. Pub. Schs.*, No. 1:16-cv-1604, 2017 WL 3599639, at *4 (E.D. Va. Aug. 18, 2017) (holding that the plaintiff "has not plausibly alleged a similarly situated comparator," when the complaint alleged a specific white male teacher as a comparator but failed allege facts that would support his "comparable role").

Plaintiff's disparate treatment claim fails. Count I must be dismissed. Plaintiff will also be denied leave to amend as futile.

2.  Hostile Work Environment

Plaintiff's second claim is that she was subjected to a hostile work environment, in violation of Title VII. *See* Am. Compl. ¶¶ 42–55.

A hostile work environment in violation of Title VII "exists when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Boyer-Liberto v. Fountainbleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (en banc). To state a plausible hostile work environment claim, Plaintiff must allege that (1) she "experienced unwelcome harassment"; (2) "the harassment was based on [her] race or protected activity"; (3) "the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere"; and (4) "there is some basis for imposing liability on the employer." *Holloway v. Maryland*, 32 F.4th 293, 300 (4th Cir. 2022). Plaintiff's hostile work environment claim fails because her factual allegations, taken as true and drawing

all reasonable inferences in her favor, fail to establish the second and third elements of a hostile work environment claim.

Considering the second element, "[t]o establish that harassment was based on race, [the plaintiff] must show that *but for her race*, she would not have been the victim of the alleged discrimination." *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 409 (4th Cir. 2022) (quoting *Gilliam v. S.C. Dep't of Juv. Justice*, 474 F.3d 134, 142 (4th Cir. 2007) (cleaned up)) (emphasis added). While a court "may infer that harassment is based on race when the plaintiff suffered harassment more often than others of different races or suffered harassment of a kind likely to be motivated by race," a plaintiff "cannot rely on her own 'conjecture' to impute a racial character to what appears to be neutral harassment." *McIver*, 42 F.4th at 409 (internal citations omitted).

The Court need not take at face value Plaintiff's allegations that are conclusory, devoid of factual enhancement, and no more than legal conclusions. *Iqbal*, 556 U.S. at 663, 678. Plaintiff's allegations that she "was subjected to pervasive harassment during her employment with the Defendant," Am. Compl. ¶ 44, and like conclusory assertions, are not entitled to a presumption of truth.

Plaintiff does offer two instances in her First Amended Complaint in which she claims harassment that include some supporting facts: (1) that "Plaintiff endured being hit by a glass door by a coworker"; and (2) that "another coworker … became verbally abusive and shook her finger in the Plaintiff's face." *Id.* ¶¶ 47–48 (cleaned up). Plaintiff alleges, apparently regarding the first incident, that "Defendant acknowledged physical harassment by a coworker towards plaintiff" but "did not intervene to stop the physical harassment." *Id.* ¶¶ 45–46. And she alleges that "Defendant acknowledged emotional harassment by another coworker" to Plaintiff,

concerning the second incident. *Id.* ¶ 48. Plaintiff further claims that she "reported both instances to her supervisor," and that the Health Director for BRHD "was also made aware of these incidents." *Id.* ¶¶ 49–50. According to Plaintiff, the "HR Representative … addressed one microaggression by setting up a peer mediation session with the other coworker involved," but that during her employment with Defendant, "no other intervention or interdiction by Defendant was used to stop harassment towards Plaintiff." *Id.* ¶¶ 51–52. Lastly, Plaintiff alleges that "other Black and Brown coworkers faced similar microaggressions." *Id.* ¶ 53. It appears that Plaintiff has nothing more than "'conjecture' to impute a racial character to what appears to be," at most, "neutral harassment." *See McIver*, 42 F.4th at 409. Nothing in Plaintiff's two alleged instances of harassment include facts from which this Court could discern any racial component or character. Much less do Plaintiff allegations establish that "but for" her race, she would not have been subjected to the alleged discrimination. *See id.* This is a far cry from those instances in which this element is satisfied. *See, e.g.*, *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 314 (4th Cir. 2008) (coworkers "frequently used religious epithets or other religiously derogatory terms when referring to [the claimant]").

Plaintiff's allegations in her First Amended Complaint also fail to establish the third element of a hostile work environment claim—that "the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere." "Whether the environment is objectively hostile or abusive is judged from the perspective of a reasonable person in the plaintiff's position." *Boyer-Liberto*, 786 F.3d at 277. "That determination is made by looking at all the circumstances, which may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*

(internal quotation marks omitted). Yet "Title VII does not create a 'general civility code' in the workplace." *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 335 (4th Cir. 2010) (quoting *Onacle v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)). And "rude treatment, callous behavior, or routine difference of opinion and personality conflict, without more, will not suffice." *Holloway*, 32 F.4th at 301 (cleaned up). Plaintiff's allegations fail this element as well. While Plaintiff alleges that another coworker "became verbally aggressive" and "shook her finger in the Plaintiff's face," Am. Compl. ¶ 48, that does not pass muster. Indeed, the Fourth Circuit has "reject[ed] [a plaintiff's] contention that one episode of yelling and pounding the table, even considered with [the plaintiff's] other allegations, is sufficiently severe or pervasive to establish an abusive environment." *Holloway*, 32 F.4th at 301 (citation omitted).

Plaintiff's other allegation fares no better. Plaintiff alleges, in full, that "[she] endured being hit by a glass door by a coworker." Am. Compl. ¶ 47. To be sure, while "*race-based physical threats undeniably strengthen[] a hostile work environment claim*," *BFI Waste Servs., LLC*, 375 F.3d at 298 n. 6 (emphasis added), yet again, here Plaintiff's complaint lacks any factual allegations that would impute any racial motivation or discriminatory animus behind the act, or that would characterize it as an act of discrimination. It would be impermissible, pure "conjecture" to make such an unreasonable inference. *See McIver*, 42 F.4th at 409. In any event, neither this event alone, or in connection with the totality of allegations, would establish a sufficiently severe or pervasive abusive and hostile work environment. *See, e.g.*, *Mercer v. Cook Cnty., Illinois*, 527 F. App'x 515, 519, 521 (7th Cir. 2013) (describing incident where supervisor "bumped into [plaintiff], … hard enough that [plaintiff] was expecting him to acknowledge it, but that he did not and merely kept walking," and holding that, "even if this incident were not

accidental, it would not constitute the kind of severe or pervasive conduct necessary to create an objectively hostile work environment").

Plaintiff's allegations underlying her hostile work environment claim in her proposed Second Amended Complaint remain vague and conclusory. She alleges unspecified "instances of aggression by a white coworker" or "by coworkers," that she was "[r]emoved from her position on the Mobile Unit" when she reported those "instances of aggression," and that she "found it difficult to work due to the amount of racially motivated aggressions …." *See* Second Am. Compl. ¶¶ 49(B), (C), 54. Again, there is no factual description of those "instances of aggression," in number or nature. She continues to allege that an unnamed person "hit[] Plaintiff with a glass door," without elaboration, and argues that constituted an "experience[ ] of harassment." *Id.* ¶ 49(A). And she alleges that her "[t]ermination … without cause," constituted another "experience[ ] of harassment." *Id.* ¶ 49(D). But Plaintiff fails to allege any facts that would, taken as true, establish any racial component or motivation to the instance when she was hit with a glass door, or her termination. These allegations continue to fail to establish that "*but for her race*, she would not have been the victim of the alleged discrimination," *McIver*, 42 F.4th at 409 (emphasis added), or that "the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere," *Holloway*, 32 F.4th at 300.

Because she has failed to allege a plausible hostile work environment claim, Count II fails as a matter of law. Plaintiff will not be afforded leave to amend on account of futility in the requested amendment.

3.  Retaliation

Plaintiff's third and final claim is that BRHD retaliated against her, in violation of Title VII. *See* Am. Compl. ¶¶ 56–63.

Title VII's anti-retaliation provision "makes it unlawful for an employer to 'discriminate' against employees or applicants because they have opposed discrimination or 'made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing' under the Act." *Laurent-Workman v. Wormuth*, 54 F.4th 201, 212 (4th Cir. 2022) (42 U.S.C. § 2000e-3(a)). To state a claim for retaliation, a plaintiff must allege "(1) that she engaged in a protected activity, (2) that her employer took an adverse action against her, and (3) that there was a causal link between the two events." *See id.*

Much if not all of Plaintiff's retaliation claim falters on the first element—that she engaged in a protected activity. "Protected activities fall into two distinct categories: participation or opposition." *Laughlin v. Met. Wash. Airports*, 149 F.3d 253, 259 (4th Cir. 1998) (citing 42 U.S.C. § 2000e-3(a)). On the one hand, "participation" includes "(1) making a charge; (2) testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding, or hearing under Title VII." *Id.* These activities are "vigorously protected to ensure employees' continuing access to the EEOC and the enforcement process." *Id.*

On the other hand, "[o]pposition activities include staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities," but "only when an employee has an objectively reasonable belief in light of all of the circumstances that a Title VII violation has happened or is in progress is the employee's conduct protected." *McIver*, 42 F.4th at 411 (cleaned up). Thus, "[e]mployees engage in protected oppositional activity when, inter alia, they complain to their superiors about suspected violations of Title VII." *Boyer-Liberto*, 786 F.3d at 281 (internal quotation marks omitted). Title VII protects an employee who opposes both actions that are "actually unlawful under Title VII" and those she "reasonably believes to be unlawful." *Id.* at 282. The "threshold for oppositional conduct is not onerous"—

rather, "[w]hen an employee communicates to her employer a belief that the employer has engaged in … a form of employment discrimination, that communication virtually always constitutes the employee's *opposition* to the activity." *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015) (quoting *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009)). However, "Title VII is not a general bad acts statute," and as such, "it does not prohibit employers from retaliating against an employee based on her opposition to discriminatory practices that are outside the scope of Title VII." *Bonds v. Leavitt*, 629 F.3d 369, 384 (4th Cir. 2011) (citing *Crowley v. Prince George's County, Md.*, 890 F.2d 683, 687 (4th Cir. 1989)).

Although the allegations in her retaliation claim in her First Amended Complaint are conclusory and lacking any factual elaboration, Am. Compl. ¶¶ 56–63, in her brief, Plaintiff points to three potential "protected activities" based on other allegations in her complaint and statements in her EEOC Charge of Discrimination. *See* Dkt. 19 at 11–14. First, she contends that she "report[ed] the aggression and discrimination that she was experiencing to her Human Resources Department and other supervisory authorities." *Id.* at 13. Second, Plaintiff asserts that she "reported discriminatory operation of vaccine clinics in minority areas as compared to those in predominantly white areas." *Id.* Third, Plaintiff argues that she "continuously pushed for diversity and inclusion training" until she was terminated in on October 5, 2023. *Id.*

Because none of the activities Plaintiff describes occurred during an ongoing investigation or EEOC proceeding, the Court must consider whether these activities constitute oppositional conduct.

Turning to her second and third purported protected activities first, the Court concludes that neither constitutes oppositional conduct, and thus, does not constitute protected activity

within the meaning of Title VII. Plaintiff asserts that she "reported discriminatory operation of vaccine clinics in minority areas as compared to those in predominantly white areas," and she argues that was opposition to "activity made illegal by Title VII." Dkt. 19 at 13. But it is not. As discussed, the Fourth Circuit has repeatedly "emphasized, however, that Title VII is not a general bad acts statute." *Crowley*, 890 F.2d at 687 (cleaned up). Indeed, this case is similar to *Crowley*. There, the Fourth Circuit considered a plaintiff's claim that he was retaliated against under Title VII "for his involvement in the investigation of racial harassment claims against the police department." *Id.* However, the court disagreed that the plaintiff had stated "a claim for discriminatory retaliation" under Title VII, explaining that the statute "forbids discrimination against an employee 'because he has opposed any practice *made an unlawful employment practice* by this subchapter, or because he has … participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Id.* (emphasis in *Crowley*). However, the Fourth Circuit noted that the plaintiff "complains, however, not that he has been retaliated against for investigating discriminatory *employment* practices within the police department, but for investigating instances of racial harassment perpetrated by officers against members of the community." *Id.* (emphasis in *Crowley*). Thus, the Fourth Circuit determined that accepting the plaintiff's claim would "authorize retaliation actions under Title VII for anyone whose job entails the investigation of any claim of discrimination against his or her employer, without regard to whether the claimed discrimination relates to a practice of employment," as the statute so provides. *Id.* Thus, "[s]uch a claim simply is not cognizable under Title VII." *Id.*

So too here, Plaintiff's complaint that she reported to Defendant "that [she] believed that the clinics for the Black and Brown communities were not being handled in an equal way to the clinics for Caucasian communities," Dkt. 2-1 (EEOC charge), is not a claim for discriminatory

*employment* practice by the Defendant, and as such, does not constitute oppositional conduct that is a protected activity under Title VII. *See also Bonds*, 629 F.3d at 383–85 (holding that plaintiff National Institutes of Health employee who claimed that she was opposing racial discrimination by seeking to destroy cell lines created in sickle-cell clinical drug trials from material provided by African Americans, was not protected activity under Title VII because it was not opposition to unlawful employment practice); *Okusami v. Md. Dep't of Health & Mental Hygiene*, No. 18-cv-1701, 2019 WL 1003607, at *23 (D. Md. Feb. 28, 2019) (rejecting Title VII retaliation claim because, while the plaintiff psychiatrist had a plausible claim that he "opposed [his employer's] position on patient treatment," and alleged, "on that basis, [the employer] subsequently fired him," that was not activity "protected under Title VII") (citing *Bonds*, 629 F.3d at 384).

Plaintiff's argument that she engaged in "protected activity" by "consistently push[ing] for training regarding diversity and inclusion" also fails for similar reasons. *See* Dkt. 2-1 (EEOC charge). Plaintiff alleges that she sought "to give appropriate input concerning diversity and inclusion training for all employees," and that she "consistently pushed for training regarding diversity and inclusion." Am. Compl. ¶ 9; Dkt. 2-1 at 3. However, she alleges that her "request for diversity and inclusion training was met with dismissiveness from multiple supervisors," and that her request to do so was denied. Am. Compl. ¶¶ 9, 23. Accordingly, Plaintiff claims that "[b]ecause [BRHD] denied [her] request for diversity and inclusion training, [she] endured racial and gender discrimination, harassment, and retaliation for errors that could have been avoided with training, such as company-wide diversity and inclusion training." *Id.* ¶ 10. These allegations are also highly conclusory and lack any factual elaboration concerning the content of the proposed training, the reason for the training, the "fixable errors" that resulted from the lack of training, who committed such errors, and what "discrimination, harassment, and retaliation" was

24

exhibited in response. It would be pure conjecture to accept that these allegations concern actions

taken by Plaintiff as "complaint[s] to [her] superiors about suspected violations of Title VII." *See*

*Boyer-Liberto*, 786 F.3d at 281 (internal quotation marks omitted).

Plaintiff also has asserted that she "was subjected to racially motivated microaggressions

by a co-worker (Caucasian), which [she] reported to [her] direct supervisor," other supervisors,

and Human Resources. Dkt. 2-1 at 3. And she has alleged that, "[o]n or about July 16, 2021,

[she] met with different individuals in Human Resources to discuss the microaggressions

displayed against me by my co-worker (Caucasian) and that I believed I was being discriminated

against because of my race (African American)." *Id.* To be sure, "[c]omplaining to one's

supervisors of discrimination on the job is a protected activity." *Abdelbaki v. N. Va. Community*

*Coll.*, No. 1:21-cv-73, 2022 WL 811296, at *10 (E.D. Va. Mar. 16, 2022) (citing *Washington v.*

*Digital Equip. Corp.*, 968 F.2d 1213, at *4–5 (4th Cir. 1992) (unpublished)). However, for the

reasons stated above, Plaintiff's underlying allegations concerning discrimination against her are

vague and conclusory and fail to include factual content that would permit any plausible claim of

racial discrimination. *See, e.g.*, Am. Compl. ¶¶ 10, 19, 20, 22, 23, 25, 32–39, 44–53, 58–60.

Plaintiffs' allegations of her complaints of such alleged discrimination—again, in highly

conclusory terms—similarly fails to establish a plausible claim that Plaintiff was objecting to

conduct she "reasonably believe[d] to be unlawful" under Title VII, and thus would constitute

protected activity. *See Boyer-Liberto*, 786 F.3d at 282; *see also Barnhill v. Garland*, --- F. Supp.

3d ---, 2022 WL 18585322, at *9 (E.D. Va. Oct. 19, 2022) ("Vague allegations such as these,

largely unrelated to specific discriminatory practices, does not support the inference that Plaintiff

was engaging in protected activity.").

Yet, even assuming Plaintiff has established that she engaged in protected activity, her retaliation claim plainly falters on the third element—establishing "a causal link" between any protected activity and her termination.[5] "To satisfy the third element, the employer must have taken the adverse action *because* the plaintiff engaged in a protected activity." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (emphasis in original). "Causation can be shown in two ways: by 'show[ing] that the adverse act bears sufficient temporal proximity to the protected activity,' or by showing 'the existence of facts that suggest that the adverse action occurred because of the protected activity,' or a combination of the two." *Laurent-Workman*, 54 F.4th at 218–19 (quoting *Smith v. CSRA*, 12 F.4th 396, 417 (4th Cir. 2021)). Plaintiff has done neither.

To start, there are no allegations supporting directly that Plaintiff was terminated because of her protected activity. Again, Plaintiff's conclusory allegations that simply recite elements of her retaliation claim are not entitled to a presumption of truth. Am. Compl. ¶¶ 60–61 (alleging that "Defendant retaliated against Plaintiff for participating in the protected activity," and that "[s]pecifically, Defendant terminated Plaintiff for her participation in the protected activity"); *Iqbal*, 556 U.S. at 663. And she has also failed to allege facts that, taken as true, would establish sufficient temporal proximity. To the extent Plaintiff has alleged that she reported perceived discrimination on account of various microaggressions to her supervisors, and they convened a meeting with Human Resources on July 16, 2021, to discuss the incident, *see* Dkt. 2-1; *see also supra*, that two-and-a-half-month gap is far too remote in time from her termination on October

---

[5] There is no dispute that Defendant terminated Plaintiff's employment, and that constituted an adverse action against her. *See* Dkt. 15 at 13; *Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999) (explaining that "hiring, firing, [and] failing to promote," can constitute "tangible employment action" from which "Title VII liability can arise").

5, 2021, to render plausible that she was terminated on account of the meeting or her underlying reporting.

Similarly in *Laurent-Workman*, the Fourth Circuit held that when there was "at least a two-month temporal gap" between the plaintiff's last known Title VII complaint and her non-selection for a position, that was "sufficiently long so as to weaken significantly the inference of causation between the two events." 54 F.4th at 219. To be sure, there is no "bright-line rule" for temporal proximity, *see id.*, but given the two-and-a-half-month gap in time in this case, and the lack of any non-conclusory factual allegations that could bridge the gap,[6] the Court concludes that Plaintiff has not stated a plausible retaliation claim.

Plaintiff's allegations in her proposed Second Amended Complaint would fail to state a Title VII retaliation claim for substantially similar reasons—specifically, failure to plausibly allege the first element (engaging in protected activity) and the third element (a causal link between the protected activity and adverse action). Plaintiff largely appears to drop her assertion that it was protected activity for her to report alleged discriminatory operation of vaccine clinics in minority areas. *See* Second Am. Compl. ¶¶ 59–65. Instead, Plaintiff asserts that her report of "the discrimination prohibited by Title VII that she had experienced to her Human Resources

---

[6] Plaintiff's argument that she also continued to "consistently push[ ] for training regarding diversity and inclusion" after her July 16, 2021, meeting until the date of her termination on October 5, 2021, fails to bridge the temporal gap to establish any plausible inference of causation. Indeed, while Plaintiff alleged that her "request for diversity and inclusion training was met with dismissiveness from multiple supervisors," Am. Compl. ¶ 23, nowhere does she allege that her supervisors had that reaction at any point between July and October 2021. It would be impermissible speculation to assign infer a date that Plaintiff's supervisors had such reaction to Plaintiff. In any event, even if Plaintiff had alleged that her supervisors exhibited "dismissiveness" to her requests for diversity and inclusion training after her July 16, 2021 meeting, that, without more, falls far short of rendering it plausible that Plaintiff was terminated in October 2021, because she reported discrimination earlier in the year and held a meeting with Human Resources about it in July 2021.

Department and other supervisory authorities," was protected activity, as was her "consistently pushing her supervisory authorities to mandate diversity training to correct discriminatory behaviors." *Id.* ¶¶ 60–64. As explained above, Plaintiff's underlying allegations of racial discrimination are conclusory and fail to establish any plausible claim to discrimination under Title VII or a hostile work environment. Similarly, accepting her allegations that she reported such perceived discrimination to Human Resources and her supervisors in equally conclusory terms, *id.* ¶¶ 60–62, and that she pushed for diversity training "to correct discriminatory behaviors," *id.* ¶¶ 63–67, fail to establish that Plaintiff was engaged in protected activity by opposing actions that were either "actually unlawful under Title VII" or that she "reasonably believe[d] to be unlawful." *Boyer-Liberto*, 786 F.3d at 282.

In addition, Plaintiff's allegations in the proposed Second Amended Complaint similarly fail to establish the third element of the claim—a causal link between the adverse action and the asserted protected activity. The Second Amended Complaint includes very few dates or other temporal benchmarks. Indeed, the Court notes that numerous dates included in prior iterations of the complaint were stripped out. Plaintiff has alleged that she was hired in March 2021 and that her position was terminated on October 5, 2021. Second Am. Compl. ¶¶ 6, 16. Plaintiff's use of temporal language without any factual adornment does not, without more, render plausible the requisite causal link. *See id.* ¶¶ 65A (alleging her removal from the Mobile Unit "immediately following" her reporting of "racially motivated aggression"); 65B (alleging her "sudden removal" from the football game); 65C (alleging her "sudden, causeless termination"). For each (or nearly every) permutation of her retaliation claim, Plaintiff's allegations—now bereft of any

temporal benchmarks—further fail to establish a causal link between the alleged adverse action and the asserted protected activity.[7]

Plaintiff's retaliation claim under Title VII also fails to state a claim, and because allowing amendment would be futile, leave to amend is denied.

### Conclusion

For these reasons, the Court concludes that Plaintiff has failed to state a claim, and accordingly, in an accompanying Order to follow, the Court will dismiss her Amended Complaint and deny as futile Plaintiff's motions to amend and/or file the proposed Second Amended Complaint.

The Clerk of Court is directed to send a copy of this Memorandum Opinion to the parties.

Entered this 16th  day of March, 2023.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

---

[7] To be sure, Plaintiff does allege one other temporal benchmark besides the date of her hiring and termination—that she emailed her supervisors asking them to "mandate Race Matters training in late September." Second Am. Compl. ¶ 67. As she was terminated on October 5, 2021, there is greater temporal proximity for that permutation of her retaliation claim. For the reasons set forth above, however, in that instance her retaliation claim fails because she has not plausibly asserted that she was engaged in protected activity.